**Doris CLARKSON, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

**and**

**Janice Whan, Mark Brock, Terryton Harrison, Riss Powell, Glennis Robertson, and Larry Randall, Individually and on Behalf of All Others Similarly Situated, Plaintiff–Intervenors,**

**v.**

**Thomas A. COUGHLIN, III, Individually and in His Capacity as Commissioner of the New York State Department of Correctional Services, et al., Defendants.**

No. 91 Civ. 1792 (RWS).

United States District Court, S.D. New York.

June 16, 1995.

The Legal Aid Soc., Helaine Barnett, Attorney–in–Charge, Civil Div., Scott A. Rosenberg, Director of Litigation (Jane E. Sabel, Brigitte Laforest, of counsel), Proskauer, Rose, Goetz & Mendelsohn (William E. Hellerstein, of counsel), New York City, for plaintiffs.

Dennis C. Vacco, Atty. Gen., New York City (Frederic L. Lieberman, Edward J.

Curtis, Jr., Asst. Attys. Gen., of counsel), for defendants.

## OPINION

SWEET, District Judge.

In this class action brought by deaf and hearing-impaired inmates in the custody of New York's Department of Corrections, plaintiffs move for declaratory judgment as to the existence of the statutory and constitutional rights they assert, for summary judgment on all their claims pursuant to Rule 56, Fed.R.Civ.P., and for preliminary and permanent injunctive relief. The claims asserted by the plaintiffs are:

(i) discrimination based on disability in violation of § 504 of the Rehabilitation Act, 29 U.S.C. 794 ("§ 504");

(ii) discrimination based on disability in violation of Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131–12133;

(iii) denial of due process of law in disciplinary, grievance, administrative and parole proceedings and interviews in violation of the due process clause of the Fourteenth Amendment of the U.S. Constitution, U.S. Const. amend. XIV, § 1 (the "Due Process Clause");

(iv) deliberate indifference to the needs of deaf and hearing-impaired inmates in violation of the Due Process Clause;

(v) deprivation of equal protection under the law in violation of the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, U.S. Const. amend. XIV, § 1 (the "Equal Protection Clause");

(vi) infringement of the rights of deaf and hearing-impaired inmates to confidential medical and mental health communications and decision-making in violation of the Fourteenth Amendment of the U.S. Constitution, U.S. Const. amend. IX & XIV, § 1 and

(vii) deliberate indifference to the serious medical needs of deaf and hearing-impaired inmates in violation of the Eighth Amendment to the U.S. Constitution, U.S. Const. amend. VIII.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Plaintiffs have standing to press their constitutional claims under 42 U.S.C. § 1983 ("§ 1983").

For the reasons set forth below, this motion will be granted in part and denied in part.

### The Parties

Plaintiff Doris Clarkson ("Clarkson") was from October 1988 until June 1991 an inmate incarcerated by the New York State Department of Correctional Services ("DOCS"). Clarkson has been deaf since early childhood and communicates using American Sign Language ("ASL").

Plaintiff-intervenor Janice Whan ("Whan") was from August 1990 until January 1992 an inmate of DOCS. Whan is hearing-impaired, suffering from congenital, degenerative hearing loss, and communicates by lip reading and with the assistance of hearing aids.

Plaintiff-intervenor Mark Brock ("Brock") was from 1986 to 1993 an inmate of DOCS. Brock has been incarcerated in DOCS' Downstate Correctional Facility ("Downstate"), Auburn Correctional Facility and at the Eastern Correctional Facility ("Eastern"). Brock has been completely deaf since birth, and communicates primarily through ASL.

Plaintiff-intervenor Terryton Harrison ("Harrison") has been from February 1992 to the present an inmate of DOCS. He was incarcerated at Downstate for approximately three months and was then at Clinton Correctional Facility ("Clinton"). Previously, Harrison was incarcerated at the Elmira Correctional Facility ("Elmira"), Attica Correctional Facility ("Attica") and at the Sensorially Disabled Unit at Eastern (the "SDU"). Harrison is deaf, and he communicates primarily through ASL. He has virtually no residual hearing, cannot lip read well and his speech is not understood by hearing persons.

Plaintiff-intervenor Riis Powell ("Powell") has been from early 1992 to the present an inmate of DOCS. Powell is currently incarcerated at the SDU of the Eastern Correctional Facility. Previously he was housed at the Downstate and Coxsackie Correctional Facilities. Powell is deaf from birth, has

virtually no residual hearing or ability to speak, and communicates primarily through ASL. He has limited ability to communicate in written English.

Plaintiff Glennis Robertson ("Robertson") was from May 1991 to approximately December 1993 an inmate of DOCS. Robertson is hearing-impaired, and communicates through ASL, Signed English, and lip reading. She cannot communicate well by reading or writing English. Her reading comprehension was tested by DOCS as grade level 2.9.

Plaintiff Larry Randall ("Randall") was from 1989 to April 1994 an inmate of DOCS. He served his sentence at the Attica, Greenhaven and at Southport Correctional Facilities. He was transferred to Sing Sing Correctional Facility ("Sing Sing") after he became seriously ill, and was given medical parole in April 1994. Randall is hearing-impaired, and hears through the use of hearing aids.

These named plaintiffs represent two subclasses of deaf and hearing-impaired inmates as defined in this Court's decision of January 25, 1993. The plaintiff class was certified as two distinct sub-classes, one male (the "Male Sub-Class") and one female (the "Female Sub-Class") described as follows:

(a) all present and future deaf and hearing-impaired male inmates of the New York State Department of Correctional Services who have been, are, or will be discriminated against, solely on the basis of their disability, in receiving the rights and privileges accorded to all other inmates; and

(b) all present and future deaf and hearing-impaired female inmates of the New York State Department of Correctional Services who have been, are, or will be discriminated against, solely on the basis

of their disability, in receiving the rights and privileges accorded to other inmates.

*Clarkson v. Coughlin,* 145 F.R.D. 339, 347–48 (S.D.N.Y.1993) (*"Clarkson II "*).[1]

Defendant DOCS is a department of New York State. Defendant Thomas A. Coughlin III is Commissioner of DOCS ("Coughlin") and is responsible for the supervision, management and control of all DOCS facilities. DOCS receives federal financial assistance in excess of $7 million. As a department of New York State, DOCS is a "public entity" within the purview of the ADA, 42 U.S.C. §§ 12131, 12132.

Defendant Robert Greifinger is Deputy Commissioner and Chief Medical Officer of DOCS ("Greifinger"). He is responsible for the provisions of health care services to DOCS inmates, the organization and supervision of DOCS' Division of Health Services and the performance of DOCS' health care employees.

Defendant Susan Butler is Deputy Commissioner for Program Services of DOCS ("Butler"). She is responsible for the delivery of program services to DOCS inmates, including recreation, education and visiting.

Defendant Elaine A. Lord is Superintendent of Bedford Hills Correctional Facility ("Lord"). Lord is charged with the supervision, management, and control of Bedford Hills, including directing the work and defining the duties of all subordinate officers and employees of that facility.

Defendant Bridget Gladwin is Superintendent of the Taconic Correctional Facility ("Gladwin"). Gladwin is charged with the supervision, management, and control of Taconic, including directing the work and defining the duties of all subordinate officers and employees of that facility.

---

1. The Court's reference in *Clarkson II* to "all present and future deaf and hearing-impaired male inmates of the New York State Department of Correctional Services" does not include deaf or hearing-impaired male inmates incarcerated at the SDU with the exception of those members of the Male Sub-Class who were, are or may be or may have been:

(i) only sent to the SDU after DOCS learned that they had become a plaintiff in this action;

(ii) placed at the SDU after reception and classification or extended classification and then transferred out of the SDU for disciplinary purposes, administrative segregation, protective custody, safety of other inmates, medical reasons or mental health reasons; or

(iii) only sent to the SDU after inordinate delay. Other than these exceptions, this action does not address the rights of deaf and hearing-impaired male inmates incarcerated in the SDU.

Defendant Walter Kelly is Superintendent of Attica ("Kelly"). Kelly is charged with the supervision, management, and control of Attica, including directing the work and defining the duties of all subordinate officers and employees of that facility.

Defendant Daniel Senkowski is Superintendent of Clinton Correctional Facility ("Senkowski"). Senkowski is charged with the supervision, management, and control of Clinton, including directing the work and defining the duties of all subordinate officers and employees of that facility.

Defendant Stephen Dalsheim is Superintendent of Downstate ("Dalsheim"). Dalsheim is charged with the supervision, management, and control of Downstate, including directing the work and defining the duties of all subordinate officers and employees of that facility.

Defendant Raul Russi is Chair of the New York State Board of Parole and Head of the New York State Division of Parole ("Russi"). He has superintendence, management and control of all New York State Board of Parole and Division of Parole hearings and services.

Defendant Richard C. Surles ("Surles") is Commissioner of the New York State Office of Mental Health ("OMH"). Pursuant to N.Y. Corr. Law § 401, DOCS has designated the Office of Mental Health to provide psychiatric services to inmates in the State correctional system. These defendants are sometimes referred to herein collectively as the "Defendants".

### Prior Proceedings

Clarkson initiated this action by filing a Class Action Complaint on March 15, 1991. On March 26, 1991, she brought an Order to Show Cause seeking access to the requested services, among other relief. Clarkson filed her First Amended Class Action Complaint on May 10, 1991. Defendants answered on May 17, 1991. On June 14, 1991, the date on which Clarkson was paroled, the Defendants moved for dismissal of the action and transfer. Motions for intervention, joinder of additional defendants and class certification were filed on August 9, 1991. In an opinion of February 4, 1992 this Court granted the motions for intervention and joinder and denied all other motions pending at the time. *Clarkson v. Coughlin,* 783 F.Supp. 789 (S.D.N.Y.1992) (*"Clarkson I"*).

Plaintiffs filed further motions seeking joinder of additional defendants, intervention by additional plaintiffs and certification of a class. After stipulation by the parties and with permission of this Court the respective return dates of these motions were reset. By opinion dated January 25, 1993, this Court granted: (i) the additional motion to intervene, (ii) the motion to join additional defendants, (iii) leave to amend the complaint, and (iv) certification of the plaintiff class and the two sub-classes within it, one of male and one of female deaf or hearing-impaired inmates in DOCS custody. *See Clarkson II.*

Plaintiffs filed their Second Amended Class Action Complaint on March 29, 1993. Defendants answered once again on April 30, 1993. Plaintiffs in turn filed another Amended Complaint on June 8, 1993.

A final round of amendment to the complaint and corresponding answer concluded with Defendants' filing on September 26, 1994. Plaintiffs filed the instant summary judgment motion on August 3, 1994. After stipulations extending the time for Defendants to file responsive papers and for Plaintiffs to reply, oral argument was heard on the within motion on February 8, 1995 at which time the motion was deemed fully submitted.

### The Facts

There are two different forms of communication through manual signs commonly used by deaf people in this country—Signed English and ASL. Signed English is a form of English in which each spoken word is accorded a corresponding manual "sign" and these signs are used with their customary syntax and in their customary word order. Signed English is essentially a system for visually paraphrasing spoken English.

Although ASL also utilizes manual signing, it is best thought of as a foreign language used by American deaf people, with its own grammar and syntax. Proficiency in Signed

English, regardless of degree, does not facilitate communication in ASL, and vice versa.

The certification exam administered by the National Registry of Interpreters for the Deaf is considered the most reliable means of ascertaining the competence of a sign language interpreter. *See* Joint Committee on Access to the Courts, *Improving the Access of Deaf and Hearing–Impaired Litigants to the Justice System,* 48 The Record of the Association of the Bar of the City of New York, 834, 839 (1993). A qualified sign language interpreter is defined in the federal regulations appurtenant to the ADA as one who is "able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104.

A telephone communication device for the deaf ("TDD") is a device which uses the electronic transmission of text to allow deaf persons to communicate via telephone, with deaf persons or hearing persons who have access to a TDD, or with hearing persons who do not have a TDD, via a third-party relay service. Telecommunication is facilitated for some hearing-impaired people by use of amplified handsets.

A closed-captioned decoder is an apparatus which "subtitles" the spoken text on television or film so that deaf and hearing-impaired persons can follow television programs.

Visual alarm systems are devices which visually alert deaf persons to emergencies such as building fires, by means of a flashing light or other visual cue. Hearing impaired individuals who are not completely deaf are sometimes assisted through the installation of amplified alarms.

Berthlynn Terry ("Terry") is DOCS' Deputy Commissioner for Affirmative Action and the head of its Office of Affirmative Action which is responsible for development and implementation of policies regarding inmates with disabilities. Terry is the person identified by DOCS as having knowledge and information pertaining to compliance with the Rehabilitation Act and the ADA. In deposition testimony she indicated that she was unaware of any "formal mechanism" in the prison system by which inmates can discuss their needs for reasonable accommodations based on disabilities. The documentary record reveals no form by which inmates could request such an accommodation, and defendants did not submit their evaluation, required by the ADA, of their programs for disabled inmates.

Lorraine Waldron, a corrections counselor employed by DOCS at Downstate ("Waldron") has taken classes in sign language. In a system which assigns a corrections counselor to every inmate, Waldron has been and is assigned as the counselor to some of the male class members who arrived at Downstate for reception and classification. According to her declaration, Waldron's sign language abilities are "not highly developed." The record is silent on whether Waldron can communicate in ASL, the primary mode of communication used by several of the male named plaintiffs.

Although a precise number is not alleged, the parties agree that at any given time there may be over fifty inmate members of the plaintiff class. The complete range of auxiliary aids and assistive devices required to permit class members to participate fully in and benefit from the programs, services and activities DOCS makes available to non-disabled inmates is not present in each of the facilities in which class members are incarcerated.

Up to thirty deaf and hearing-impaired and visually-impaired male inmates may be, at any given time, serving part of their sentences in the SDU, which is a special unit within Eastern for persons with sensorial disabilities where they receive services to accommodate their disabilities. Prior to placement in the SDU all of the deaf and hearing-impaired male inmates spend months in DOCS' reception and classification facilities ("Reception Facilities") which are not equipped or staffed to provide the complete range of auxiliary aids and assistive devices they require. Members of the Male Sub–Class are incarcerated in general population facilities for some or all of their incarceration. At these facilities the full range of auxiliary aids and assistive devices is either incomplete or wholly unavailable. Members

of the Female Sub–Class are incarcerated in general population facilities for the entire length of their incarceration, because the SDU presently houses only male inmates and is the only such facility in the DOCS system.

Individuals committed to DOCS' custody are first sent to facilities designated as Reception Facilities where they are processed and assessed to determine appropriate long-term facility placements in the correctional system. The statutorily mandated purpose of program and classification procedures is:

to assure the complete study of the background and condition of each inmate in the care or custody of the department and the assignment of such inmate to a program that is most likely to be useful in assisting him [sic] to refrain from future violations of the laws. Such procedures ... shall require ... consideration of the physical, mental and emotional condition of the inmate; ... his educational and vocational needs; ... the danger he presents to the community or to other inmates; the recording of continuous case histories ...; and periodic review of case histories and treatment methods used.

N.Y. Correction Law § 137(1). Downstate is a Reception Facility.

At the Reception Facilities information is acquired from inmates through interviews with counselors and review of background materials which accompanied inmates into DOCS' custody. DOCS is required by New York statute to conduct a psychiatric evaluation of each inmate. N.Y. Correction Law § 148 (McKinney 1987). Inmates who are identified as having special medical or mental health needs are sent to a special unit within a Reception Facility, called "extended classification" to undergo more extensive educational, medical and intelligence testing. While incarcerated in a Reception Facility inmates receive no educational, vocational or rehabilitative training. After some time in a Reception Facility, each inmate is placed more or less permanently in a long-term DOCS facility. Inmates who go though extended classification are evaluated by classification analysts and other professionals, and as a result of these evaluations may be assigned to specialized units within DOCS for their long-term placement. Some, but not all, of the deaf and hearing-impaired male inmates are referred from extended classification to the SDU. Other deaf or hearing-impaired inmates who may need the services provided in the SDU are referred to other long-term facilities because of medical, security or disciplinary reasons.

Upon arrival in any DOCS' facility, inmates are assigned counselors who are to work with inmates throughout their prison stay. DOCS' counselors are required to evaluate the educational, vocational and programmatic needs of inmates in their custody. Counselors are required to conduct appropriate psychological, intelligence, educational and vocational evaluations as are necessary to make appropriate program and service placements. It is the counselor's role to supplement the evaluation process with input from inmates regarding programs which may be helpful to them.

State administrative regulations encourage DOCS to provide telephone and television privileges to all inmates in DOCS custody. *See* 7 N.Y.C.R.R. § 320.3(e) ("[v]isiting, phone calls, and correspondence shall be encouraged as a vital part of rehabilitation.") DOCS is required to maintain a grievance process through which inmates can seek redress when actions or inaction of DOCS' staff negatively affect their incarceration. *See* 9 N.Y.C.R.R. § 7654. DOCS is charged with maintaining inmates in a safe physical environment. New York Correction Law § 45(6). DOCS is responsible for providing inmates with timely and appropriate medical and mental health care. New York Correction Law §§ 45(6), 148. Finally, inmates have procedural due process protections in disciplinary and parole board proceedings. *See* 7 N.Y.C.R.R. Part 250 *et seq.* (disciplinary proceedings); 9 N.Y.C.R.R. § 8000 *et seq.* (parole proceedings).

Defendants are aware of Plaintiffs' respective hearing disabilities and the extent to which these disabilities interfere with each inmate's ability to participate in DOCS programs and activities.

Plaintiff Clarkson has been deaf since early childhood. She has virtually no speech

ability and her comprehension of spoken or written English is severely limited. Her primary language is ASL. Clarkson is unable to lip read or communicate in Signed English.

Clarkson was incarcerated in the Bedford Hills Correctional Facility for almost three years from October 1988 to June 1991. Defendants knew that she needed a sign language interpreter and assistive devices in order to communicate effectively. She never received the services of a qualified sign language interpreter, nor any assistive devices, such as a TDD. Clarkson was never provided with access to a qualified sign language interpreter for medical or psychiatric care, even after the Superintendent of Bedford Hills was notified that Clarkson had been administered the Human Immunodeficiency Virus (HIV) test without her knowledge and informed consent. The priest who advised Clarkson regarding her rights to consent or refuse HIV testing could not communicate effectively with her in ASL.

Clarkson was prescribed three daily medicines. Because she is deaf and Defendants could not communicate effectively with her, however, she never understood what they were for. It was alleged that she had a psychiatric condition, yet no evaluation or counseling of her mental health condition was done in the presence of a sign language interpreter.

Clarkson was enrolled in educational programs while at Bedford Hills, including Adult Basic Education and Arts and Crafts but she received no instruction through a sign language interpreter.

Before Clarkson was to meet with the Parole Board in March 1991, she attended several interviews with Parole Board staff to ascertain her plans for the future. She was not provided with an interpreter at these interviews.

Janice Whan suffers from congenital, degenerative hearing loss caused by prenatal exposure to rubella. She also suffers from glaucoma. Whan's hearing loss got progressively worse while she was an inmate at DOCS' Taconic Correctional Facility from August 1990 until January 1992. Originally she required only one hearing aid but by the time she was released from DOCS' custody she needed two.

Whan communicates with hearing people by reading lips, but depends on hearing aids to give much needed auditory cues when trying to follow conversation. She requested the hearing aids and DOCS did not provide them until ten months after her request. While at Taconic, Whan could not hear the fire alarm, could not follow television because there is no closed-caption decoder and lacked the amplified handset that she needed in order to use the telephone.

Whan had difficulty following her prison orientation and other programs. Whan explained her problems to the Program Committee and her counselors, but no action was taken to provide her with the requisite hearing aids or accommodations she needed to hear and lip read more effectively. On several occasions DOCS' medical staff loudly discussed Whan's medical problems in close proximity to other inmates.

Plaintiff Brock is deaf and has been deaf since birth. His primary method of communication is ASL. Brock cannot read or write English well. In order to make himself properly understood, Brock requires the assistance of a qualified sign language interpreter.

Brock was an inmate at Downstate for over six months. Shortly after Brock moved to intervene in this case, he was transferred to the SDU. On a previous incarceration from 1986 to 1988 Brock was housed in the SDU, except for several months when he was transferred to the Auburn Correctional Facility for disciplinary or security reasons.

During his time at Downstate, Brock was not provided with the services he needs despite his obvious hearing-impairment, his direct requests for assistance, and a notation sent from the Rikers Island Pre–Screening Unit to DOCS staff at Downstate which indicated that Brock "requires sign language." Although Downstate is a Reception Facility which does not offer inmates educational or vocational programming, the few programs, services and privileges offered to hearing inmates at Downstate were not accessible to

Brock because he is deaf. Because Brock does not write English well and was not given access to a qualified sign language interpreter, he was unable to explain his medical condition during doctor's appointments and he could not participate in an Alcoholics Anonymous ("AA") counseling program. His educational, vocational and medical needs were never evaluated with the assistance of an interpreter. Nor was he provided with adequate sign language interpreter services during disciplinary proceedings. At Downstate, Brock's counselor assisted him in his disciplinary proceeding. Although the counselor was familiar with Signed English, she is not fluent in ASL and is not a qualified interpreter. Brock could not make himself understood by his counselor or anyone else at Downstate.

Brock's request to his counselor for a TDD was denied. He was told that she could make calls for him. Consequently, Brock could not make private telephone calls. In addition, he could not watch television because there was no closed-caption decoder. Brock missed morning count because he could not hear the public announcement system. He was at risk of harm because there was no visual alarm system. None of these services were provided to Brock during his incarceration at Auburn either.

Harrison is a deaf inmate who is currently incarcerated at Clinton. Harrison has virtually no residual hearing and primarily communicates in ASL. Harrison cannot lipread well and his speech is not understood by hearing persons.

Between 1985 and 1987, Harrison was housed at Elmira for approximately six months, then at the SDU for two years. For security reasons, Harrison was then transferred out of the SDU to Attica.

Harrison began his current incarceration in February 1992 at Downstate, where he was placed in extended classification because of his deafness and mental health needs. The classification analyst recommended that although Harrison's needs could best be served in the SDU at Eastern, he should be placed in an alternative maximum security setting because of prior problems he had dealing with deaf inmates at the SDU. Har-

rison was transferred to Clinton on May 30, 1992.

At Clinton, Harrison was considered for inclusion in two special programs. He was denied admission into the Merle Cooper Program, a therapeutic program for inmates because he was found "unable to benefit from group therapy due to hearing impairment." Initially he was also denied admission to the Assessment and Program Placement Unit ("APPU"), a special unit for victim prone inmates, because "Harrison is a deaf mute, a condition for which the APPU program has no services." Harrison was transferred to the Clinton APPU on or about November 14, 1992 where he presently does not have access to a sign language interpreter.

At no DOCS facility other than the SDU was Harrison provided with access to qualified sign language interpreters or other services he needed to participate in prison programs and activities. At Attica, Harrison was denied all programming because of his deafness and stayed in his cell twenty-four hours a day. At no DOCS facility was he permitted to participate in a group drug and alcohol rehabilitation program because he had no access to an interpreter. In the Clinton APPU, there are no programs or services accessible to deaf inmates.

Harrison has been disciplined in several DOCS facilities without being provided a qualified sign language interpreter either in preparation for or during his disciplinary proceedings. On January 6, 1994, Harrison was disciplined for disobeying two direct orders from corrections officers that he did not understand. The record contains the statement by a corrections officer: "Harrison was ordered to pick up a cup in the mess hall. I ordered him by pointing to the cup because I know that he is deaf." On another occasion a corrections officer reported that he ordered Harrison "with directed hand motions" to clean up a mess. Although Harrison asked in writing for a sign language interpreter to be present at the disciplinary hearing, he was told by the hearing officer at the hearing that Clinton does not have access to sign language interpreters. The hearing was conducted by an exchange of written messages.

While at Attica, Harrison received fifteen days in "keeplock" after a disciplinary hearing in which he was not provided with an interpreter. Harrison also met with parole officers at Attica and Elmira without being provided with an interpreter.

Plaintiff Powell is a deaf inmate who has been in DOCS' custody since February 1992. On May 12, 1992, Powell was transferred from the extended classification at Downstate to the SDU. Powell was previously incarcerated at the SDU and at DOCS' Coxsackie Correctional Facility ("Coxsackie").

Powell has been totally deaf since birth with virtually no residual hearing or ability to speak, and limited ability to communicate in written English. Powell's reading comprehension level, as tested by DOCS, is at a third grade level.

The New York State Supreme Court Justice who sentenced Powell wrote a letter to Defendants stating that Powell "needs two levels of sign language interpreters to comprehend and to communicate." Defendants were made aware of Powell's requirements when they received a Presentence Investigation Report on Powell from the New York City Department of Probation, dated January 23, 1992, advising them about the types of services and assistive devices he would need to function in a DOCS facility:

> Powell is a deaf mute and was interviewed with the aide [sic] of two sign language interpreters. Powell stated that while he has been incarcerated, he has been unable to communicate with other inmates, hence, rendering him isolated, and "left out." Powell requests that he be housed with other deaf inmates and that he be kept informed of the daily activities at the correctional facility. In addition, the defendant stated "a telephone communication system for the deaf and closed captioned television would enable him to keep contact with his family and with the 'outside world.'"

During his incarcerations at Downstate, and his earlier incarcerations at Elmira and Coxsackie, Powell was not provided with access to a qualified sign language interpreter for any purpose, including disciplinary proceedings. Although allowed to enroll in Downstate's AA program, Powell could not understand or participate in the AA program because there was no qualified sign language interpreter present. He was not provided with a TDD, a closed captioned television decoder, or a flashing alarm for morning count or fire drills. He did not have any means of understanding the public announcement system.

Plaintiff Robertson has been severely hearing-impaired since birth. While she has limited residual hearing in her left ear with hearing aids, to communicate with others she depends mainly upon ASL, Signed English and lip reading.

Robertson's ability to lip read is not sufficient for her to communicate with the hearing world by lip reading alone.[2]

Robertson cannot communicate well by reading or writing English. Her reading comprehension is at the 2.9 grade level. Robertson was an inmate at DOCS' Groveland Correctional Facility ("Groveland") and then at Bedford Hills Correctional Facility from May 1991 to approximately December 1993. Her transfer to Bedford Hills was the result of a disciplinary hearing at Groveland in which she was not provided with an interpreter, and which resulted in a three month period of severely limited privileges.

Robertson's programming options were curtailed because she was not provided with a sign language interpreter. She was removed from a drug counseling program at Groveland when correctional staff realized she could not follow the group discussions. Robertson was then repeatedly denied access to such a program at Bedford Hills during 1992. Robertson's failure to enter a drug counseling program was used in part to deny her application for temporary release. She has requested assistive services and an interpreter at both Groveland and Bedford Hills,

**2.** As was noted in this Court's prior opinion, Robertson's correct name is Glennis *Robinson*, not Robertson. Due in part to Defendants' failure to accommodate for her disability, she continues to be addressed by a name that is not hers and to have all of her records entered under the wrong name. *See Clarkson II* at 340, n. 1.

but they have not been provided. Lack of auxiliary aids impeded her ability to talk to her children's foster mother on the telephone and to watch television.

Plaintiff Randall was a hearing-impaired inmate in DOCS custody from 1989 to April 1994 when he was given a medical parole. Randall served his sentence at Attica and, after he became seriously ill, at Sing Sing. Randall has severe hereditary bilateral sensorineural hearing loss in both ears. Randall requires two hearing aids. From February 1991 to June 1991, one of Randall's hearing aids was broken and he was forced to use only one aid. From June 1991 to on or about May 1992, both of Randall's hearing aids were broken, and he was without any means of communication for that period. Randall could not function in a school program without his hearing aids, and he was denied access to a work program. He was without a work or educational program for over one year due to his being without hearing aids. No alternative accommodation was made to permit Randall to benefit from any prison school or work program. Additionally, Randall was not provided with an amplified telephone handset which he requires in order to communicate by telephone.

Plaintiff Ripic has been an inmate in DOCS' custody since November 9, 1993. She has been incarcerated at the Bedford Hills Correctional Facility. Ripic is deaf and communicates only through ASL. Prior to her arrival at Bedford Hills, the staff at the Broome County Jail, the Southern Tier Independent Center, and Ripic's lawyer all informed DOCS of her need for a sign language interpreter, a TDD and a closed caption decoder. The New York State Advocate for the Disabled was also involved in efforts to obtain accommodations for Ripic's disability.

Four months after her arrival at Bedford Hills, Ripic received some of the services she needs. Instead of access to a qualified sign language interpreter, Bedford Hills identified two inmates to translate for Ripic when needed. They are not certified interpreters, and they are not always available. They are sometimes unable to translate such that Ripic can understand and be understood. Ripic

has several serious medical conditions, including congenital heart failure, and during medical appointments, she is unable to comprehend doctors' medical recommendations and is unable to ask follow-up questions about treatment options and medications.

Ripic has been depressed and suicidal since her incarceration but none of her communications with Defendants' medical or mental health staff have been through qualified sign language interpreters.

No vocational evaluation of Ripic was done because no sign language interpreter was available. She was assigned to two classes, a basic education class and a horticulture class. An inmate who can sign is also enrolled in the basic education class; she translates, but inadequately. When that inmate is absent, Ripic is completely cut off from goings on the class. In the horticulture class Ripic is entirely without the benefit of translation.

Ripic is similarly forced to depend on other inmates to communicate with DOCS personnel in the medical and mental health context. An OMH psychiatrist who evaluated Ripic without the aid of a qualified sign language interpreter, noted that Ripic is "understandably frustrated and 'nervous' about the difficulty in communicating in the prison environment. Her worries/concerns are appropriate and not out of proportion to these objective stressors."

### Discussion

The legal standards applicable to Plaintiffs' motion will be applied to the facts described above.

In their failure to provide notice of rights to accommodations and available assistance, to consult with disabled inmates as to the most effective form of accommodation, to complete a statutorily required self-evaluation and to formulate and effectuate grievance procedures regarding accommodations, Defendants have violated the ADA. By failing to provide interpretive services during reception and classification, through the absence or inadequacy of assistive communications devices for telephone and television and by their failure to provide visual safety alarms, Defendants have violated both § 504 of the Rehabilitation Act and the ADA.

By their failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions, Defendants have violated class members' constitutional due process rights and the ADA.

Further, by their failure to provide qualified interpreters or other needed assistive devices for medical and mental health treatment Defendants have violated class members' constitutional due process rights and, in those cases in which communication between patient and medical personnel is essential to the efficacy of treatment, violated the Eighth Amendment's proscription against cruel and unusual punishment.

By their failure to provide qualified interpreters or other needed assistive devices for disciplinary, grievance and parole proceedings, Defendants have violated class members' constitutional due process rights. Finally the Female Sub–Class has suffered an equal protection violation by virtue of Defendants' creation and maintenance of the males-only SDU, which created a classification based on gender without a strong justification.

### A. *Rule 56 Standards for Summary Judgment*

Plaintiffs move for summary judgment in their favor pursuant to Rule 56. The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330, n. 2, 106 S.Ct. 2548, 2556, n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Bare assertions cannot serve to raise genuine issues of material fact and a non-movant opposing summary judgment may not rest upon conclusory allegations or denials. *See* Rule 56, Fed.R.Civ.P.; *Park Ave. Tower Assocs. v. City of New York,* 746 F.2d 135, 141 (2d Cir.1984); *Project Release v. Prevost,* 722 F.2d 960, 970 (2d Cir.1983); *In re B.D. International Discount Corp. v. Chase Manhattan Bank,* 701 F.2d 1071, 1077 n. 11 (2d Cir. 1983); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). If the movant has met its burden under Rule 56 of proffering sufficient evidence to show that there is no genuine issue of material fact present, then the opposing party must produce significant probative evidence which tends to support its position. *United States v. Pent–R–Books,* 538 F.2d 519, 529 (2d Cir. 1976).

A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see Iacobelli Construction, Inc. v. County of Monroe,* 32 F.3d 19,

23 (2d Cir.1994). Dispute as to material fact is "genuine," and hence summary judgment is not appropriate, only if evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See* Rule 56, Fed. R.Civ.P.; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 580 (2d Cir. 1991).

Summary judgment is appropriate under these standards as to Plaintiffs' claims that (i) Defendants have violated the notice, consultation, self-evaluation and grievance procedure requirements of the ADA; (ii) Defendants have violated both the Rehabilitation Act and the ADA by their failure to provide interpretive services for various aspects of reception and classification; (iii) the absence or inadequacy of assistive communications devices for telephone and television and the absence of visual safety alarms violates both the ADA and the Rehabilitation Act; (iv) Defendants' failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions violates the ADA and Plaintiffs' due process rights; (v) Defendants' failure to provide qualified interpreters and/or other assistive devices during medical and mental health treatment violates class members' constitutional due process and privacy rights, and in those cases in which communication between patient and medical personnel is essential to the efficacy of treatment, the Eighth Amendment's proscription against cruel and unusual punishment; (vi) Defendants' failure to provide qualified interpreters and/or other assistive devices in disciplinary, grievance and parole proceedings violates class members' due process rights; (vii) transfers out of, or refusals to transfer into, the SDU for disciplinary, safety, medical or mental health reasons violate the ADA and the Rehabilitation Act; and (viii) Defendants' creation and maintenance of a special prison unit at which all or most of the needs of deaf and hearing-impaired inmates are accommodated—the SDU—but from which women are excluded based on gender violates the equal protection rights of the Female Sub–Class, about which there are no genuine issues of material fact.

## B. *Declaratory Judgment*

Plaintiffs seek declaratory judgment as to the rights of the Plaintiff class. This Court has authority to render a declaratory judgment pursuant to 28 U.S.C. § 2201(a), which states:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The two criteria guiding the policy in favor of rendering declaratory judgments are (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding. *See Continental Casualty Co. v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir.1992); *Broadview Chemical Corp. v. Loctite Corp.,* 417 F.2d 998 (2d Cir. 1969), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970). If either prong of this test is met, the request for declaratory judgment should be entertained. *Continental,* 977 F.2d at 737; *Broadview,* 417 F.2d at 1001.

Under these authorities declaratory judgment is appropriate with respect to: the class' claims of violations of the Due Process Clause, the Rehabilitation Act and the ADA in Defendants' failure to provide accommodations in vocational and academic classroom instruction and in alcohol and drug rehabilitation counselling; Plaintiffs' claim that provision of medical treatment to class members without the assistance of a qualified interpreter, or other assistive devices, violates class members' privacy, due process and Eighth Amendment rights; the class' claim that Defendants' failure to provide interpretive services or other assistive devices to class members during disciplinary, grievance and parole proceedings is a violation of their

due process rights and of the ADA and the Rehabilitation Act; and Plaintiffs' claim that Defendants' creation and maintenance of a special prison unit at which all or most of the needs of deaf and hearing-impaired inmates are accommodated, and which special unit is not available to women deprives Female Sub–Class members of equal protection under the law.

### C. *Injunctive Relief*

 Plaintiffs seek a preliminary and permanent injunction. The standard for granting a preliminary injunction in this Circuit is a showing of (1) irreparable injury and (2) a likelihood of success on the merits or (a) sufficiently serious questions going to the merits to make them a fair ground for litigation and (b) the balance of hardships tipping in favor of the movant. *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994); *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 135–36 (2d Cir.1992); *SEC v. Unifund SAL*, 910 F.2d 1028, 1038 n. 7 (2d Cir.1990); *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir.1988). The Second Circuit considers the showing of irreparable harm to be "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell Mamiya Co. v. Masel Supply Corp.*, 719 F.2d 42, 45 (2d Cir.1983)). Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction will not issue. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). Monetary loss will not suffice unless the movant shows damage that cannot be rectified by financial compensation. *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). The law in this Circuit requires a showing that irreparable damages are likely, not merely possible. *JSG Trading Corp.*, 917 F.2d at 79; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must actually succeed as to the merits

rather than a showing of likelihood as to that success in some future proceeding. *See, e.g., Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1993); *University of Texas v. Camenisch*, 451 U.S. 390, 392, 101 S.Ct. 1830, 1832 n. 12, 68 L.Ed.2d 175 (1981). In the instant action, this standard dovetails with that of summary judgment. If it is found that no genuine issue of material fact exists as to any one of plaintiffs' claims, then the injunction relief sought regarding that claim will be granted permanently. In the event that at least one genuine issue of material fact has been joined regarding a claim, this Court will then weigh the probability of plaintiffs' success on that claim in considering whether to grant preliminary injunctive relief.

With respect to all of the claims for which summary judgment is granted, the requirement of irreparable harm has been met and Plaintiffs have succeeded on the merits.

### *Statutory Claims*

### *Section 504 of the Rehabilitation Act*

 Plaintiffs allege that DOCS has discriminated against them in violation of § 504 of the Rehabilitation Act. Section 504 guarantees that individuals who are qualified to participate in a program or activity will have meaningful access to the program or activity if offered by a grantee of federal funds. *See Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985); *Rothschild v. Grottenthaler*, 907 F.2d 286, 290 (2d Cir.1990). Provided that a person's disabilities do not prevent them from meeting the essential eligibility requirements of the program or activity, the Section's guarantee of meaningful access applies. *See* 28 C.F.R. § 42.540(*l*). Where an individual does not appear initially to be otherwise qualified, a court must nevertheless evaluate whether reasonable accommodations would make the handicapped individual qualified to participate in the program or enjoy the benefit in question. *See Alexander v. Choate*, 469 U.S. at 300–01, 105 S.Ct. at 720–21; *see also Harris v. Thigpen*, 941 F.2d 1495, 1525 (11th Cir.1991).

■ The Rehabilitation Act has been held to apply to prisoner claims as a general matter. *See Harris,* 941 F.2d at 1522 n. 41; *Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988). The language of the statute indicates that any entity receiving federal funding is covered by the Act. DOCS concedes that it receives such funding. Further, the Act's references to "otherwise qualified individual with handicaps" or "qualified handicapped person" are neither expressly nor implicitly limited in such a way as to exclude state prisoners. Since class members are "handicapped persons" as defined by Section 504 in that they "a physical or mental impairment which substantially limits one or more of [their] major life activities," 29 U.S.C. § 706(8)(B)(i), they are protected by the Act. Thus since Defendants and Plaintiffs fall within the purview of the Rehabilitation Act, its prohibitions are applicable to the case at hand. The basic proscription of Section 504 is as follows:

> No otherwise qualified individual with handicaps ... as defined in ... this title ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794.

The term "otherwise qualified" is defined in the regulations as "[w]ith respect to services, a handicapped person who meets the essential eligibility requirements for the receipt of such services." 28 C.F.R. § 42.540($l$); *see Rothschild,* 907 F.2d at 291.

The regulations implementing § 504 elaborate upon the meaning of nondiscriminatory access to programs and services for disabled individuals:

> A recipient [of federal financial assistance] may not discriminate on the basis of handicap in the following ways directly or through contractual, licensing, or other arrangements under any program receiving Federal financial assistance:
>
> (i) Deny a qualified handicapped person the opportunity accorded others to participate in the program receiving Federal financial assistance(;)

> (ii) Deny a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program receiving Federal financial assistance....
>
> (iv) Deny a qualified handicapped person an equal opportunity to participate in the program by providing services to the program.

28 C.F.R. § 42.503(b)(1).

■ The Second Circuit has held that in order to state a claim under Section 504, plaintiffs must establish that: (1) they are "handicapped persons" under the Act; (2) they are "otherwise qualified" to participate in the offered activity or program or to enjoy the services or benefits offered; (3) they are being excluded from participation or enjoyment solely by reason of their disability; and (4) the entity denying plaintiffs participation or enjoyment receives federal financial assistance. *See Rothschild,* 907 F.2d at 289–90. This standard is applied to the various aspects of Plaintiffs' Rehabilitation Act claim.

Defendants concede that Plaintiffs are "handicapped persons" under the Act and that DOCS receives federal funding. They attempt to join issues of fact as to whether Plaintiffs are "otherwise qualified" for the services or benefits in question and as to whether they are being denied participation solely by reason of disability.

As is set out in detail below, Defendants have violated § 504 of the Rehabilitation Act by failing to provide interpretive services during reception and classification, through the absence or inadequacy of assistive communications devices for telephone and television, by their failure to provide visual safety alarms and by their failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions. With regard to each of these areas there are no genuine factual issues and it is established that class members are "otherwise qualified" to participate in the offered activities and programs or to enjoy the services or benefits offered and that they are being excluded from participation or enjoyment solely by

reason of their disability, the other elements of a *prima facie* § 504 claim having been conceded.

### Title II of the ADA

Like the Rehabilitation Act, the ADA and the regulations promulgated thereunder, 28 C.F.R. Part 35, prohibit discrimination on the basis of disability. The ADA became effective as of January 1992. Title II of the statute prohibits discrimination by public entities and provides:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Title II of the ADA regulates the conduct of public entities. In particular a public entity may not, either directly or through contractual, licensing, or other arrangements:

> (b)(1)(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service;
>
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others;
>
> (iii) Provide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; [or]
>
> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b).

The definition of "public entities" includes any state or local government or any department or agency thereof, or other instrumentality of a state or local government. *See* 42 U.S.C. § 12131(1). The meaning of "qualified individual with a disability" for purposes of Title II, derived via reference to the corresponding regulation promulgated under the Rehabilitation Act, is a person with a disability who, with or without a reasonable accommodation, "meets the essential eligibility requirements for the receipt of" the benefits or services in question. *See* 28 C.F.R. § 42.540(*l*) (defining handicapped individual who is "otherwise qualified" under Rehabilitation Act); 42 U.S.C. § 12133 (requiring that remedies, procedures and rights under Title II of ADA are identical to those under § 504 of the Rehabilitation Act).

As under the Rehabilitation Act, the protections afforded by the ADA turn on whether, with or without reasonable accommodations in programs and services, a disabled individual meets the essential eligibility requirements to participate in the program or receive the benefit in question. *See* 42 U.S.C. § 12131(2).

■ The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act. *See Martin v. Voinovich*, 840 F.Supp. 1175, 1192 (S.D.Oh.1993); *Galloway v. Superior Court*, 816 F.Supp. 12, 19 (D.D.C.1993). Stated in the ADA's terms, a plaintiff is expected to show that: (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity. *See Ellen S. v. Florida Board of Bar Examiners*, 859 F.Supp. 1489, 1492–93 & n. 4 (S.D.Fla.1994); *People First of Tennessee v. Arlington Developmental Center*, 878 F.Supp. 97, 100 (W.D.Tenn.1992); *see also Staron v. McDonald's Corp.*, 51 F.3d 353, 355–56 (2d Cir.1995) (under Title III, noting that when it was undisputed that plaintiffs were qualified individuals with disabilities and that defendant operated a public accommodation which plaintiffs could utilize with a reasonable accommodation and reasonableness of accommodation was the only disputed question, plaintiffs had stated a colorable claim); *Galloway v. Superior Court*, 816 F.Supp. at 19.

In addition to its anti-discrimination provisions, the Department of Justice's regulations implementing the ADA enumerate oth-

er affirmative obligations imposed by the ADA on state agencies. Plaintiffs assert that Defendants have failed to meet these additional affirmative requirements.

First, public entities are required to provide disabled persons with the opportunity to request the auxiliary aids and services of their choice and give "primary consideration" to the preferences expressed. DOJ, Technical Assistance Manual, Title II, ADA, II–7.1100.

The ADA also requires that persons with disabilities receive notice of the protections the statute affords them. Public entities must "make available to ... beneficiaries, and other interested persons information regarding the ... protections against discrimination as assured them by the Act and this part." 28 C.F.R. § 35.106. In addition, 28 C.F.R. § 35.163 provides that "a public entity shall ensure that interested persons, including persons with impaired ... hearing, can obtain information as to the existence and location of accessible services, activities, and facilities."

ADA-related regulations require public entities to determine the most appropriate auxiliary aid or service, and stress the importance of consultation with disabled individuals, because they are most familiar with their particular disabilities and are in the best position to determine what type of aid or service will be effective. DOJ, Technical Assistance Manual, Title II, ADA, II–7.1100.

The ADA also requires covered entities to conduct a "self-evaluation" of agency programs, services and physical plant to determine what modifications of policy and structure are necessary to comply with the ADA. 28 C.F.R. § 35.105. "Once a public entity has identified policies and practices that deny or limit the participation of individuals with disabilities in its programs, activities, and services, it should take immediate remedial action to eliminate the impediments to full and equivalent participation." DOJ, Technical Assistance Manual: Title II of the ADA, II–8.2000. Even where agencies earlier conducted a self-evaluation under the Rehabilitation Act, the ADA requires the agency to expand the self-evaluation to incorporate programs or services not covered under § 504 or

not included in the § 504 self-evaluation. 28 C.F.R. § 35.105(d). Agencies were given until January 26, 1993, one year from the effective date of the Department's regulations, to complete the ADA self-evaluation.

Finally, regulations promulgated under the ADA require covered entities to develop a grievance mechanism available to individuals who claim that the state or local agency has failed to honor some or all of its affirmative obligations to make programs and services accessible to disabled individuals. *See* 28 C.F.R. § 35.107.

As will be discussed in detail, Defendants have violated the ADA by their failure to notify class members of the protections to which they are entitled under the ADA, consult with class members as to effective accommodations, perform a self-evaluation and provide a grievance mechanism concerning the accessibility of programs and services; their failure to provide interpretive services during reception and classification, through the absence or inadequacy of assistive communications devices for telephone and television and by their failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions. As with § 504, the there are no genuine factual issues regarding the fact categories just described. The elements of a *prima facie* claim under Title II of the ADA having been established summary judgment in favor of Plaintiffs will issue.

### *Constitutional Claims*

#### *Denial of Due Process*

Plaintiffs assert that they have been unable, due to Defendants' failure to provide interpretive services and assistive devices, to invoke or fully participate in various proceedings to protect their rights while incarcerated, including, *inter alia*, the grievance mechanism, disciplinary and good-time proceedings, change-of-status hearings and preliminary parole board proceedings, in violation the due process clause of the Fourteenth Amendment. Plaintiffs also note that such deprivations violate state laws and regulations. *See* 7 N.Y.C.R.R. Part 250 *et seq.*,

(disciplinary proceedings); N.Y. State Executive Law § 259–i(7), 9 N.Y.C.R.R. § 8000 *et seq.* (parole proceedings); 7 N.Y.C.R.R. § 701.10, 9 N.Y.C.R.R. § 7654 (grievance procedures); 7 N.Y.C.R.R. § 260 *et seq.* (good behavior allowances).

■ Prisoners claiming a procedural due process violation under the Fourteenth Amendment must demonstrate that they have been deprived of a protected liberty or property interest by governmental action. *Meachum v. Fano,* 427 U.S. 215, 223–225, 96 S.Ct. 2532, 2537–2538, 49 L.Ed.2d 451 (1976). These interests may arise from the Constitution, *see e.g., Vitek v. Jones,* 445 U.S. 480, 493–94, 100 S.Ct. 1254, 1263–1264, 63 L.Ed.2d 552 (1980), from state statutes, *see e.g., Wolff v. McDonnell,* 418 U.S. 539, 556–58, 94 S.Ct. 2963, 2974–76, 41 L.Ed.2d 935 (1974), or from administrative regulations and procedures, *Domegan v. Fair,* 859 F.2d 1059, 1063–64 (1st Cir.1988); *Williams v. Lane,* 851 F.2d 867, 879–81 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989) (regulations requiring equal housing and program opportunities for inmates in protective custody create liberty interest); *Association for Reduction of Violence v. Hall,* 558 F.Supp. 661, 663–64 (D.Mass.1983), *vacated and remanded on other grounds,* 734 F.2d 63 (1st Cir.1984).

Courts have identified specific liberty interests of inmates upon which a state cannot impinge without due process. *See Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 1036–1037, 108 L.Ed.2d 178 (1990) (liberty interest in freedom from unwanted administration of medication); *Board of Pardons v. Allen,* 482 U.S. 369, 377–78, 107 S.Ct. 2415, 2420–21, 96 L.Ed.2d 303 (1987) (liberty interest in parole where state statute makes parole mandatory under enumerated conditions); *Hewitt v. Helms,* 459 U.S. 460, 470–71, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983) (liberty interest in inmate's right to remain free of administrative restrictive confinement when state statute and regulations create the right with mandatory language and substantive reasons for confinement); *Wolff v. McDonnell,* 418 U.S. 539, 557–558, 94 S.Ct. 2963, 2975–2976, 41 L.Ed.2d 935 (1974) (liberty interest in prison-

er's good-time credits); *Walker v. Bates,* 23 F.3d 652, 655 (1994) (imposition of restrictive confinement for disciplinary reasons implicates a liberty interest); *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (good time); *McKinnon v. Patterson,* 568 F.2d 930, 938–39 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (disciplinary keeplock); *see also Domegan,* 859 F.2d at 1063–64 (liberty interest found in rules requiring regular meals, electricity and water for segregation inmates).

■ Plaintiffs assert that they have been deprived of liberty and property interests without due process by Defendants' failure to provide them with qualified sign language interpreters for all aspects of disciplinary proceedings. New York State inmates have a protected liberty interest, created by State regulations, in remaining free from administrative confinement, which interest triggers due process requirements. *See Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990); *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir. 1989); *McKinnon v. Patterson,* 568 F.2d 930, 938–39 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Prior to the imposition of such punishment the inmate is entitled to a hearing with various procedural safeguards.

■ That process to which inmates are entitled regarding administrative confinement is comprised of notice of the charges against them and an opportunity to present their views to the prison official charged with deciding whether confine them. *Helms,* 459 U.S. at 476, 103 S.Ct. at 873. It has also been held that the inmate must have notice of the evidence available to the fact-finder. *See Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985).

■ An inmate confined pending a disciplinary hearing is entitled to an informal opportunity to be heard within a reasonable time after his confinement, perhaps even before his hearing. *See Gittens,* 891 F.2d at 40–41 (citing *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)). Similarly, when an inmate is segregated for an extended period of time for purposes other than disciplinary proceedings,

he is entitled to a hearing. *See Wright v. Smith,* 21 F.3d 496, 499–500 (2d Cir.1994). Because of the protected interest created by New York law, even if his administrative confinement is less than 14 days, an inmate must have "some · notice of the charges against him, and a minimal opportunity to present his views to prison officials." *Matiyn v. Henderson,* 841 F.2d at 36.

■ Inmates' opportunity to be heard and refute disciplinary charges must be "meaningful" and is not so if the inmate is deprived of the right to call witnesses. *See Jermosen v. Coughlin,* 878 F.Supp. 444, 450 (N.D.N.Y.1995).

DOCS is obligated by New York State regulations to provide non-English speakers with assistants and translators in disciplinary process. *See* 7 N.Y.C.R.R. Pts. 251 and 253. The Appellate Division has held that an inmate who does not speak English must be provided with an assistant or a translator who speaks the inmate's language and failure to meet this requirement eliminates the inmate's meaningful opportunity to defend against the charges. *See Rivera v. Smith,* 110 A.D.2d 1043, 489 N.Y.S.2d 131 (1985). A narrow set of circumstances concerning the provision of a translator has been delineated by a New York court under which no violation of due process occurs. When prison officials correctly determined that a Spanish-speaking inmate was, in fact, bilingual and the inmate did not select a translator or assistant from the list of corrections employees provided by prison officials, but selected instead a prisoner/translator whose efforts were effective in having one charge dropped, the Appellate Division held that there had been no due process violation. *See Peart v. Kelly,* 134 A.D.2d 843, 521 N.Y.S.2d 592, 593 (1987).

■ Plaintiffs assert a protected liberty interest in parole board proceedings. Mandatory language in a state parole statute may create such an interest, *see Board of Pardons v. Allen,* 482 U.S. 369, 377–78, 107 S.Ct. 2415, 2420–21, 96 L.Ed.2d 303 (1987); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12–13, 99 S.Ct. 2100, 2106–2107, 60 L.Ed.2d 668 (1979). The language of New York's parole statute is such that it creates a presumption of parole release after certain conditions are met, thus creating a limited protected liberty interest which extends as far as an inmates right to be heard and, if parole is denied, a right to a statement of reasons for the denial. *See* N.Y. Corrections Law §§ 212, 805 (McKinneys 1987 & 1995 Supp.); *People ex rel. Hunter v. Bara,* 144 Misc.2d 750, 545 N.Y.S.2d 65, 66 (N.Y.Sup.Ct.1989).

■ Specifically as to class members, Plaintiffs assert the existence of liberty interest created by state statute mandating interpreters for the deaf at all proceedings before the parole board. N.Y.Exec.L. § 259–i(7) (providing that "whenever any deaf person participates in an interview, parole release hearing, preliminary hearing or revocation hearing, there shall be appointed a qualified interpreter who is certified by a recognized national or New York State credentialing authority"). As a general matter, due process is understood require an opportunity to heard in a meaningful manner. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Calhoun v. N.Y. State Div. of Parole Offcrs.,* 999 F.2d 647, 653 (2d Cir.1993). The mandatory language of § 259–i(7), read in combination with the basic protected liberty interest of New York inmates in an opportunity to be heard at parole-related proceedings and the requirement that they be heard in a meaningful manner, requires the conclusion that when the parole-related liberty interest of class members is at stake, sufficient process must include the presence of a qualified interpreter to facilitate class members' being heard.

■ Plaintiffs argue that New York law also endows inmates with a protected property interest in receiving a program of education. The statute provides, in relevant part: "[E]ach inmate shall be given a program of education which, on the basis of available data, seems most likely to further the process of socialization and rehabilitation." N.Y. Correction Law § 136 (McKinney 1987). With reference to *Hewitt,* 459 U.S. at 470–71, 103 S.Ct. at 870–71, § 136

must be examined to determine whether its language is of a mandatory character, granting an unqualified interest to the plaintiff, or rather conveying an interest that is subject to discretion of an agent of the state. Section 136 simply commands, in the requisite mandatory terms, that each inmate be given "a program of education." The "substantive predicate" also described in *Hewitt* is not relevant here, since the statute does not concern the legal denial of the right in question upon the existence of such a predicate. *See* 459 U.S. at 470–71, 103 S.Ct. at 870–71. Some property interest is created by this provision but no case cited by the parties or known to the Court defines the contours of this property interest. The outer limit of its boundaries has been noted twice in recent years. *See Jones v. Grunewarld,* 644 F.Supp. 256, 259 (S.D.N.Y.1986) (§ 136 does not confer upon inmate a protected property interest in a scholarship); *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983) (§ 136 does not confer a protected interest in both a full-time program of education and full-time prison employment). It is also significant that § 136 mandates DOCS' director of education to develop the curricula and educational programs for each correctional facility. Finally, the Appellate Division has held that the Commissioner of Correctional Services has sole discretion to *regulate* education in the prison system and observed that while § 136 does not confer upon inmates the right to any specific education, it does refer to education that assists in the inmate's return to society as a "wholesome and good citizen". *Allah v. Coughlin,* 190 A.D.2d 233, 599 N.Y.S.2d 651, 654 (1993). Thus, the statute confers upon New York inmates a protected property interest in an educational program "which, on the basis of available data, seems most likely to further the process of socialization and rehabilitation." Depriving an inmate of such a program triggers the protections of the Due Process Clause. However, given the discretionary function of corrections officials which is inescapable in the language of the statute, only the provision of no education at all or education that was wholly unsuited to the goals of a particular inmate's socialization and rehabilitation trigger those protections.

Plaintiffs' final assertion regarding due process is that Defendants have infringed upon their right, insured by the Due Process Clause, to confidential medical and mental health communications and decision-making. Inmates have a significant liberty interest in avoiding the unwanted administration of medical treatment. *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990); *see Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). It has been held that this liberty interest comprises a right to that information which is reasonably necessary to make an informed decision whether to accept proposed medical treatment, as well as a reasonable explanation of the viable alternative treatments available. *See White v. Napoleon,* 897 F.2d 103, 113 (3d Cir.1990) (prisoner allergic to penicillin has reasonable need and right to know whether proposed medical treatment contains penicillin).

Plaintiffs also assert that their constitutional right to privacy [3] in medical treatment is violated by Defendants' practice of using amateur interpreters, especially other inmates, during medical visits who do not have an obligation to keep matters discussed in their presence confidential. Prison inmates retain a constitutional right to privacy concerning medical information about them. *See Harris v. Thigpen,* 941 F.2d 1495, 1513 (11th Cir.1991); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991); *Doe v. Coughlin,* 697 F.Supp. 1234, 1238 (N.D.N.Y. 1988); *Woods v. White,* 689 F.Supp. 874, 875–77 (W.D.Wis.1988), *aff'd without op.,* 899 F.2d 17 (7th Cir.1990). A breach of this privacy right is especially problematic in the prison setting where an inmate's possession of confidential information about another inmate can be used in threatening and dangerous ways.

As will be set out in detail below, Defendants have violated class members' Fourteenth Amendment right to due process and

---

**3.** This privacy right is variously described as arising under the First, Fourth, Fifth and Fourteenth Amendments. *In re McVane v. FDIC,* 44 F.3d 1127, 1136 (2d Cir.1995).

class members' constitutional right to privacy in their failure to provide qualified interpreters or other needed assistive devices for medical and mental health treatment and disciplinary, grievance and parole proceedings. Summary judgment will be granted in favor of Plaintiffs to that extent. Summary judgment will also issue in favor of Plaintiffs regarding the due process violation in Defendants failure to provide interpreters and other assistive devices in educational and counselling settings.

### Cruel and Unusual Punishment

■ The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *see Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir.1990). "Deliberate indifference" is usually evidenced by proof that corrections personnel intentionally denied, delayed access to or interfered with prescribed treatment. *See Estelle*, 429 U.S. at 104–06, 97 S.Ct. at 291–93; *Gill v. Mooney*, 824 F.2d 192, 195–96 (2d Cir.1987); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977). The *Estelle* standard governs claims of denial of psychiatric as well as medical care. *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989).

The Court of Appeals has held that for inmates to establish deliberate indifference to serious medical needs they must show that the deprivation of medical care was sufficiently serious in objective terms, and that the charged officials must have acted with a sufficiently culpable state of mind. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994).

In examining the "seriousness" element in class actions, courts have looked for systemic deficiencies in the provision of medical care to the inmate class or a pattern of conduct indicative of indifference to the serious medical needs of class members. *See Eng v. Smith*, 849 F.2d 80, 82 (2d Cir.1988); *Dean v. Coughlin*, 804 F.2d 207, 208 (2d Cir.1986). Indifference to serious medical needs is said to occur at the institutional as opposed to the individual level when a prison's system of

medical care is so inadequate as to cause unwarranted suffering. *See Cruz v. Ward*, 558 F.2d 658, 662 (2d Cir.1977); *Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir.1974). In keeping with this principle, it has been held by that "deliberate indifference" is "a standard for measuring the adequacy of prison officials' response to the known medical needs of inmates *and their system for allowing inmates to make their needs known.*" *Dean v. Coughlin*, 623 F.Supp. 392, 402 (S.D.N.Y.1985), *vacated and remanded on other grounds*, 804 F.2d 207 (2d Cir.1986) (emphasis added).

Under certain circumstances, delay or denial of inmates' access to medical care amounts to deliberate indifference. *See Estelle*, 429 U.S. at 104–05, 97 S.Ct. at 291–92; *Liscio v. Warren*, 901 F.2d 274, 276–77 (2d Cir.1990) (failure to examine inmate going through "life-threatening" and "fast-degenerating" condition for three days could constitute deliberate indifference); *Hathaway v. Coughlin*, 841 F.2d 48, 50–51 (2d Cir.1988) (delay of two years in arranging surgery to correct pins in inmate's hip raises question of fact as to deliberate indifference of prison officials' conduct); *Gill v. Mooney*, 824 F.2d 192, 195–96 (2d Cir.1987) (denial of access to exercise program and failure to provide necessary medical treatment as punishment for misconduct states colorable constitutional claim of deliberate indifference).

■ Regarding the "state of mind" element it is said that deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm, *see Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). Repeated examples of delay or denied medical care, haphazard or ill-conceived medical practices can serve to demonstrate deliberate indifference by prison officials. *See Todaro v. Ward*, 565 F.2d 48, 52; *see also Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885; *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980). *See also Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977).

As will be seen, there are no genuine issues of material fact regarding Plaintiffs' assertion that failure to provide interpretive services and assistive devices during medical and mental health treatment rises to a systemic deficiency in all of those instances of medical care to class members in which communication between the patient and medical personnel are essential to the efficacy of the treatment in question. Therefore summary judgment will be granted as to Plaintiffs' Eighth Amendment claim regarding only that limited set of instances.

### Equal Protection

Plaintiffs assert that Defendants deny members of the Female Sub–Class equal protection of the law because Defendants provide them with fewer and less comprehensive accommodations than are provided to those male deaf and hearing-impaired inmates incarcerated at the SDU. It is first worth noting that the existence of the Male Sub–Class in this action is not inconsistent with Plaintiffs' equal protection charge. Simply put, many of the wrongs complained of any particular member of the Male Sub–Class would be alleviated if that inmate were placed in the SDU. But Defendants do not contest the fact that female inmates cannot be placed in the SDU and no corresponding facility for sensorially disabled female inmates exists in New York State for women. Thus Defendants' exclusion of members of the Female Sub–Class from the SDU creates a classification based on gender.

The equal protection clause of the Fourteenth Amendment requires that state government classifications based upon gender "serve important governmental objectives and be substantially related to achievement of those objectives." *Caban v. Mohammed*, 441 U.S. 380, 388, 99 S.Ct. 1760, 1766, 60 L.Ed.2d 297 (1979); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976); *Liberta v. Kelly*, 839 F.2d 77, 82 (2d Cir.1988). This level of scrutiny is often described as a "heightened standard of review," *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Casey v. Lewis*, 834 F.Supp. 1477, 1550 (D.Ariz.1993), or as an intermediate level of review. *West*

*v. Virginia Dept. of Corrections*, 847 F.Supp. 402, 405 (W.D.Va.1994); *Batton v. State Government of N.C., Etc.*, 501 F.Supp. 1173, 1176 (E.D.N.C.1980).

In order for a gender-based classification to withstand an equal protection challenge, the proponent of the classification must put forth an " 'exceedingly persuasive justification' for the challenged classification." *See Kirchberg v. Feenstra*, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)); *Liberta*, 839 F.2d at 79. Applying the intermediate standard of review in the prison context demands that "female inmates [ ] be treated 'in parity' with male inmates." *Casey*, 834 F.Supp. at 1550 (quoting *McCoy v. Nevada Dept. of Prisons*, 776 F.Supp. 521, 523 (D.Nev.1991)); *Bukhari v. Hutto*, 487 F.Supp. 1162, 1172 (E.D.Va.1980).

In *Casey* the female inmates alleged, *inter alia*, that the defendants, the Arizona Department of Corrections, provide male inmates with a more comprehensive program of mental health services than they provided to female inmates. *Casey*, 834 F.Supp. at 1550. The defendants did not dispute the disparate treatment but rather attempted to justify it on the grounds that there were fewer female inmates requiring mental health attention. *Id.* at 1551. The court rejected the defendants' argument noting that there was evidence that female inmates could benefit from the mental health services provided to men. *Id.* The court held that the defendants must "provide for the development of mental health programming for women, *comparable* to that provided for men." *Id.* at 1553 (emphasis added). There is no genuine issue of material fact as the whether members of the Female Sub–Class are receiving treatment comparable to that of the men in the SDU. *See also West*, 847 F.Supp. at 408 (denying women the opportunity to participate in a Boot Camp Incarceration Program violated the plaintiff's constitutional right to equal protection).

After the facts pertinent to Plaintiffs' equal protection claim are reviewed, *infra*, it will be seen that no genuine issue of material fact has been framed as to Plaintiffs' claim under

the Equal Protection Clause and summary judgment in favor of Plaintiffs will be granted.

***Legal Conclusions as to the Eight Fact Categories***

Class members argue for the application of the above-described legal theories across different factual areas in which they have alleged wrongs. The conclusions set forth above as to the wrongs Plaintiffs have asserted are grouped below into eight distinct but interrelated fact categories: (i) notice, consultation, self-evaluation and grievance procedures; (ii) provision of interpretive services for various aspects of reception and classification; (iii) absence or inadequacy of assistive communications devices for telephone and television and absence of visual safety alarms; (iv) failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions; (v) provision of qualified interpreters for medical and mental health treatment; (vi) provision of qualified interpreters in disciplinary, grievance and parole proceedings; (vii) transfers of class members into or out of the SDU for disciplinary, safety, medical or mental health reasons; (viii) creation and maintenance of a special prison unit at which all or most of the needs of deaf and hearing-impaired inmates are accommodated—the SDU—which is not available to women. These are each taken in turn.

Facts mentioned in the following discussion have been asserted and documented by Plaintiffs and either admitted or denied conclusorily without support by Defendants.

For certain of the fact categories, since one or both of the criteria for declaratory judgments, namely either that such a declaration will serve a useful purpose in clarifying and settling the legal relations in issue, and/or such a declaration will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding, a declaratory judgment will be articulated in that section. *See Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir.1992); *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir.

1969), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970).

**1. *Notice, Consultations, Self–Evaluation and Grievance Procedures***

**(a) *Notice***

██ As a public entity, DOCS is obligated by the ADA to make available to class members information regarding both the protections against discrimination provided by the statute and the existence and location of accessible services, activities and facilities. *See* 28 C.F.R. §§ 35.106; 35.163. Plaintiffs have amply supported their assertion that Defendants fail to comply with these requirements and Defendants have framed no genuine issue of fact as to this failure. Defendants concede that they have posted no signs and have distributed no information in compliance with these requirements. Defendants have distributed an ADA manual to DOCS staff, but it does not provide information to class members about the accommodations that are available to them nor does it contain procedures for DOCS employees' handling of inmate requests for accommodation.

**(b) *Consultations and Request Mechanism***

██ As a public entity DOCS must provide disabled inmates with an opportunity to request the auxiliary aids and services of their choice. *See* DOJ, Technical Assistance Manual, Title II, ADA, II–7.1100. No class member has ever had the benefit of any direct discussion with DOCS staff about their own need for interpreters or auxiliary aids and devices. DOCS has no procedures in place by which to evaluate inmate requests for reasonable accommodation.

Written requests by or on behalf of Plaintiffs for reasonable accommodations have either been denied (without fulfilling the very limited criteria under the ADA by which such requests may legally be denied), never responded to, or referred back to the inmate to address the request to someone else. What little action was taken in response to requests from class members was not timely.

Defendants are in violation of the ADA's requirements as to request procedures.

### (c) *Self–Evaluation*

 DOCS has failed to comply with the ADA's mandate to evaluate its programs and facilities for compliance with ADA. In 1981, DOCS produced a report entitled § 504 Self–Evaluation. The § 504 Self–Evaluation did not include any assessment of inmate barriers to programs or physical plan access for inmates. Regulations promulgated under the ADA require DOCS to expand that self-evaluation to include programs and facilities not covered under § 504. *See* 28 C.F.R. § 35.105(d). DOCS has just completed the physical plant and personnel portions of the self-evaluation required under the ADA. These do not include an evaluation of the housing of inmates, thus those accommodations which require changes in physical plant, such as alarm systems, have not to date been evaluated. No evaluation of inmate programs or services was conducted. Terry conceded in her deposition that DOCS does not have adequate staff to review all the relevant programs in all DOCS facilities. Thus, there is no issue as to whether DOCS is in violation of the self-evaluation obligations imposed under the ADA.

### (d) *Grievance Mechanisms*

 The record indicates that DOCS has expanded its pre-existing inmate grievance protocol to permit the filing of complaints about disability discrimination. DOCS' Office of Affirmative Action is the office which Defendants have identified as the office to which any such grievances are to be channelled. At the time of her deposition, Terry, who is in charge of that office, knew of no grievances received in her office from or on behalf of disabled inmates seeking accommodations or assistive services. Yet, the record indicates that several class members made numerous requests for accommodations or assistive services to at least one, if not several DOCS officials. It is conceded that none of these were channelled to Terry's office. The statute imposes an affirmative obligation upon public entities to create and maintain a coherent procedure by which requests for accommodations and assistive services can

ultimately have some effect. Brock and Harrison have both managed to lodge formal requests with DOCS officials only to be told that they had to make the same request to someone else or that the assistance they needed was simply not available. Thus, there is no genuine issue as to DOCS' failure to establish an effective grievance procedure for class members regarding accommodations and assistive services in facilities other than the SDU. DOCS is therefore in violation of the ADA in this respect.

It should be noted here that Defendants argue that the absence of requests exonerates them of any duty to make reasonable accommodations or provide assistive services under the ADA and the Rehabilitation Act. Rather, this absence is indicative only of DOCS' failure to comply with their obligation to create and maintain procedures for requests and grievances regarding accommodations and assistance.

In sum, there are no genuine issues of material fact as to Defendants violation of the provisions of the ADA and the Rehabilitation Act regard to notice of rights and availability of accommodations and assistive services, consultations with disabled persons as to most effective available measures, self-evaluation and grievance procedures. Summary judgment and injunctive relief will issue in favor of the Plaintiff class on these points.

Since it will serve the purpose of clarifying Defendants' obligations under the ADA as to this fact category, the Court hereby declares that an evaluation of programs and services, as well as facilities, available to disabled inmates is a required part of defendants' self-evaluation under the statute.

### 2. *Interpretive Services During Reception and Classification*

 Plaintiffs claim that by failing to provide qualified interpreters for various aspects of reception and classification, Defendants have violated both the Rehabilitation Act and the ADA. At Reception Facilities information is acquired from inmates through interviews. Inmates are subjected to psychological, educational and intelligence test-

ing. Information gleaned through these tests and interviews is then used by DOCS to determine long-term placement, educational and vocational programming, inmates need for rehabilitative services such as drug and alcohol counselling, and inmates' medical and mental health needs. The comprehensive service of the reception and classification process and the overall benefit it conveys to each inmate is critical not only to the rehabilitative goals of incarceration but to the efficient function of the prison system as well.

Plaintiffs have asserted, and proffered affidavit evidence to the effect, that class members whose primary means of communication is ASL are not provided with interpreters who are "qualified interpreters" per regulations promulgated pursuant to the Rehabilitation Act and the ADA, in the reception and classification process. Defendants have offered proof concerning the interpretive abilities and function of one counselor at Downstate—Waldron, who interpreted for some of the class members, but have not attempted to frame an issue as to whether Waldron can "interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." See 28 C.F.R. § 35.104; DOJ, Technical Assistance Manual, Title II of the ADA, II–7.1200 (the Technical Assistance Manual notes that provision by a public entity of a the services of a staff person who signs "pretty well" would not necessarily satisfy the ADA's requirements). More importantly, Defendants have not attempted to frame an issue as to whether DOCS provides, or has presently allocated sufficient resources to provide, all members of the Plaintiff class with a qualified interpreter for all interviews and tests during the reception and classification process at the Reception Facilities.

It is particularly true in the context of reception and classification that, as discussed above, the contention that ADA liability can only be triggered by a request for an accommodation from a person with a disability is reduced to a circularity by DOCS' failure give proper notice and provide a coherent and effective protocol by which class members can make their needs known. The absence of these critical elements of the ADA scheme at the Reception Facilities has truly sentenced class members to a "prison within a prison".

There being no genuine issue of material fact as whether interpretive services and assistive devices are available and sufficient to the needs of the Plaintiff class during reception and classification at the Reception Facilities, Defendants are in violation of the Rehabilitation Act and the ADA in this regard. Summary judgment and injunctive relief will issue in favor of Plaintiffs on this issue.

Since, as above, the purpose of clarifying DOCS' obligations under the ADA is served, this Court hereby declares that Defendants are under an obligation to provide qualified interpreters or, where applicable other assistive devices, during and in all aspects of the reception and classification phase of class members.

### 3. Absence or Inadequacy of Assistive Communications Devices for Telephone and Television and of Visual Alarms

 DOCS inmates generally have telephone privileges and are provided with controlled access to working telephones. At the SDU all deaf or hearing impaired inmates who require a TDD to make telephone calls are provided access to one. They are allotted 20 minutes per telephone call which is twice the time usually permitted for a call by a DOCS inmate.

Clarkson never had access to a TDD throughout her three years of incarceration. Brock requested a TDD while at Downstate, and instead of being provided with one, a DOCS employee with some signing ability made telephone calls for him. Harrison requested access to TDD while at Elmira in 1990 and again in 1992 while at Clinton. He did not receive access to one until February of 1993. Ripic first entered DOCS custody in November of 1993. The county jail which sent her to Bedford Hills informed DOCS of her need for a TDD. It was "months and months" before she received one. Robertson repeatedly requested a TDD because the lack of one has impeded her from effective communication with the foster mother of her children.

The SDU is equipped with special fire alarms that emit very loud sound and light up in the event of a fire or other emergency condition, making both deaf and hearing-impaired inmates aware of the emergency. Clarkson was never housed in a facility equipped with such an alarm so that she could be alerted in the event of a fire. Newton, DOCS' Director of Mental Health, who has system-wide responsibility for so-called "special needs" programs, knows of no facility other than the SDU which is equipped with visual alarms. At various times while incarcerated at Downstate, Auburn, Elmira or Groveland, where no visual alarms were provided, plaintiffs Brock, Powell, Randall and Robertson were completely at risk in the event of fire. Class members have also at times been subject to discipline for missing morning count, which is apparently sounded through a public address or alarm system and is inaudible to class members.

There is no genuine issue of material fact as to whether the rights of class members under the ADA and the Rehabilitation Act are violated by Defendants' failure to provide TDDs and close caption decoders wherever and whenever hearing inmates have and use telephone and television privileges.

Neither is there a triable issue as whether safety alarms which are adequate to the needs of deaf inmates are presently installed in all of the places in which they are incarcerated other than the SDU. Summary judgment will issue in favor of Plaintiffs on these points and injunctive relief will be fashioned.

**4. Failure to Accommodate in Educational, Vocational and Rehabilitative Programs**

Plaintiffs contend that Defendants' failure to make reasonable accommodations in order to facilitate full participation by class members in educational and vocational classes and in alcohol and drug rehabilitative counselling programs violates the provisions of § 504 of the Rehabilitation Act and ADA on one hand, and the constitutional due process rights of class members on the other. The contrasting standards applicable to the statutory, as opposed to the constitutional, complaint are of particular import in this fact area.

**(a) Education and Counselling Under ADA**

 Section 504 and the ADA and their respective regulations provide that qualified individuals with disabilities may not be excluded from participation in programs or be denied the benefits of services, or activities offered by public entities. See 29 U.S.C. § 794; 42 U.S.C. § 12132. Public entities are prohibited under the ADA from affording to qualified individuals with disabilities opportunities to participate in or benefit from benefits or services that are not equal to the opportunities afforded to non-disabled individuals. See 28 C.F.R. § 35.130(b). Under § 504 recipients of federal funding are similarly barred. See 28 C.F.R. § 42.503(b)(1). It is not disputed that as regards academic and vocational programs and rehabilitative counselling, class members are qualified individuals with disabilities in that, with reasonable accommodations, they meet the essential eligibility requirements for the receipt of the benefits of these vocational, academic and counselling programs. See 28 C.F.R. § 42.540(l). DOCS violates this mandate in two ways. First, it places class members in settings where, without an accommodation, their opportunity to benefit is wholly unequal to that of non-disabled inmates. For example, after failing to perform an evaluation of class member Ripic with the assistance of a qualified interpreter, DOCS placed her in a gardening course even though she was unable to follow any of the classroom instruction. Secondly, Defendants excludes class members from some programs on the basis of their disability. DOCS' Program Services Manual explicitly excludes disabled inmates from 26 academic and vocational programs. One criterion used for such exclusion is whether "a handicap ... substantially limits an inmate's ability to participate" in the program, without regard to accommodation. An example of such exclusions is class member Robertson who was removed from a drug counseling program at Groveland when correctional staff realized she could not follow the group discussions. She was then repeatedly denied access to such a program at Bedford Hills because of her disability. The application of such a criterion is a clear viola-

tion of the ADA's mandate. There is no genuine issue of material fact as to whether the rights of class members under the ADA and the Rehabilitation Act are violated by Defendants' failure to make reasonable accommodations in academic and vocational classroom education and in alcohol and drug rehabilitative counselling. Summary judgment and injunctive relief will issue in favor of Plaintiffs on this question.

Declaratory judgment will issue in favor of Plaintiffs to the effect that class members are qualified, with proper accommodations, to participate in vocational and academic classroom instruction and in alcohol and drug rehabilitation counselling and that the statutory requirements that recipients of federal funds (§ 504) and public entities (ADA) make reasonable accommodations for qualified individuals with disabilities such that they have an equal opportunity to benefit from and/or participate in the programs or services offered, extends to such educational and rehabilitative programs.

#### (b) *Due Process Rights to Education and Counselling*

■■■ Plaintiffs' assertion that Defendants' failure to accommodate violates their due process rights is limited to education. Mandatory language in the applicable state statute endows class members with a right to education protected by the due process clause. *See* N.Y. Corrections Law § 136 (McKinneys); *Hewitt v. Helms,* 459 U.S. 460, 470–71, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983). As was mentioned above, provision of no education at all or education that was grossly unsuited to the goals of a particular inmate's socialization and rehabilitation amounts to a due process violation. Although the submissions of the parties indicate that some class members may have received some education and vocational training, the record indicates that no qualified sign language interpreters were made available to any class members for educational purposes. Thus no class member received educational programming sufficient to satisfy the state statutory mandate, that is they effectively received no education or education grossly unsuited to the goals of socialization and rehabilitation. No triable issue of fact is

presented by this question and summary judgment will issue in favor of Plaintiffs as to a violation of their due process rights regarding accommodations in educational programs.

#### 5. *Provision of Qualified Interpreters and Other Assistance for Medical and Mental Health Treatment*

#### (a) *Due Process Right to Informed Consent*

■■■ Inmates have a significant liberty interest in avoiding the unwanted administration of medical treatment. *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990); *see Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). It has been suggested that a necessary corollary to the interest articulated in *Washington* and *Cruzan* is the right of inmate/patients to information sufficient to reach an informed judgment on whether to consent to a particular treatment or to refuse it. *See White v. Napoleon,* 897 F.2d 103, 113 (3d Cir.1990) (prisoner allergic to penicillin has reasonable need and right to know whether proposed medical treatment contains penicillin). Defendants point out that in at least one case—Clarkson's—the Plaintiff in question could simply have refused the medication in question. Our own Court of Appeals has apparently not yet reached this particular combination of facts. Of interest is New York's statutory definition of informed consent for purposes of medical malpractice liability, which requires a medical practitioner to "disclose to the patient such alternatives [to the treatment or medication in question] and the reasonably foreseeable risks and benefits involved as a reasonable ... practitioner under similar circumstances would have disclosed *in a manner permitting the patient to make a knowledgeable evaluation.*" N.Y. Public Health L. (McKinney 1993) (emphasis added). Without the aid of a qualified interpreter, it not possible that the relevant information could have been conveyed in an effective manner, thus this Court is persuaded that Plaintiffs' protected liberty interest is implicated by Defendants' failure to provide the necessary information through a qualified interpreter even though the plaintiff in ques-

tion may have "voluntarily" ingested the proffered medication. Summary judgment will be granted in favor of the Plaintiff class on the question of Defendants' violation of Plaintiffs' due process right in the provision of medical treatment and testing without the assistance of qualified interpreters or other necessary assistive devices.

Declaratory judgment and injunctive relief will issue to the effect that provision of medical treatment to class members without the assistance of a qualified interpreter, or where applicable, other assistive devices, is a failure to provide such information as is sufficient to informed consent in a manner permitting the inmate/plaintiff to make a knowledgeable evaluation, and therefore violates the due process rights of class members to be free from unwanted medical treatment.

**(b)** *Summary Judgment is Granted Regarding Failure to Provide Interpreters and/or Assistive Devices During Medical or Mental Health Treatment When Communication Between Patient and Medical Personnel is Critical to the Efficacy of the Treatment*

■ Plaintiffs claim that Defendants' failure to provide interpreters or other assistive services during medical treatment violates the Eighth Amendment's proscription against cruel and unusual punishment. At least two class members experienced improper and possibly harmful treatment through the provision of medical treatment in the absence of qualified interpreters. Defendants have attempted to document the adequacy of some medical treatment to some class members, achieved through written communication. However, since many forms of medical and mental health treatments depend on communication between patient and medical personnel, it is established that a systemic pattern of inadequacy of treatment exists which is causing class members unwarranted suffering. *See Eng v. Smith,* 849 F.2d 80, 82 (2d Cir.1988); *Dean v. Coughlin,* 804 F.2d 207, 208 (2d Cir.1986); *Cruz v. Ward,* 558 F.2d 658, 661 (2d Cir.1977); *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir.1974). This pattern is limited to those instances of medical care in which communication between the patient and medical personnel are essential to the efficacy of the treatment in question. Declaratory judgment will issue to that effect.

**(c)** *Constitutional Privacy Right to Confidential Treatment*

■ Defendants have attempted to utilize fellow inmates, a chaplain and DOCS personnel who are not under any obligation to maintain the confidentiality of medical information, as makeshift interpreters for purposes of administering medical care to class members. Unless the person interpreting for purposes of medical care is bound to maintain the confidentiality of the information being exchanged, the inmate/patient's constitutional privacy right is violated. *Doe v. Coughlin,* 697 F.Supp. 1234, 1240–42 (N.D.N.Y.1988) (prisoners have a right to privacy in medical information generally and especially in matters relating to HIV testing and infection); *Woods v. White,* 689 F.Supp. 874, 877 (W.D.Wis.1988), *aff'd without op.,* 899 F.2d 17 (7th Cir.1990). No material factual issue has been framed on this point and Plaintiffs will be granted summary judgment.

Declaratory judgment will issue to the effect that use of any sign language interpreter who is not bound to maintain confidentiality in the administration of medical treatment to class members is a violation of their constitutional right to privacy.

**6.** *Provision of Qualified Interpreters in Disciplinary, Grievance and Parole Proceedings*

■ Defendants conducted disciplinary, grievance and parole hearings concerning various class members without affording them the interpretive services or assistive devices necessary to render their opportunity to be heard meaningful. Various liberty and property interests were at stake in these hearings. Such conduct by a corrections department been found to be a denial due process. *See Bonner v. Arizona Dept. of Corrections,* 714 F.Supp. 420 (D.Ariz.1989) (the failure to provide a sign language interpreter at a disciplinary hearing of a blind and deaf-mute prisoner denied due process); *Wolff v. McDonnell,* 418 U.S. 539, 571 n. 19,

94 S.Ct. 2963, 2982 n. 19, 41 L.Ed.2d 935 (1974).

Defendants have pointed out that some class members pled guilty to the disciplinary charges against them, that Plaintiffs communicated at their hearings in writing, that DOCS officials were *prepared* to provide an interpreter and that class members were afforded the same treatment at parole interviews as non-deaf inmates. In this context, in which Defendants are under an affirmative burden to provide both notice of the charges against the inmate and a meaningful opportunity for the inmate to be heard, all of these assertions are beside the point. Without providing the class member in question with the particular accommodation required by that class member, it cannot be said with certainty that the inmate understands the charges or that his or her opportunity to be heard is meaningful.

The exception to the requirement for a translator or assistant articulated in *Peart v. Kelly* warrants some discussion. 134 A.D.2d 843, 521 N.Y.S.2d 592, 593 (1987). Bottomed as it was on the easily verifiable fact that the inmate could *speak* English, *Peart* sheds no useful light on the problems presented here. A native English speaker can safely evaluate the reliability of communication with a non-native speaker simply by listening to what they say—as the prison officials did in *Peart*. But in the case at bar, disciplinary and other hearings have been conducted without the presence of *anyone* who can pragmatically determine how much of what is being said is comprehended by the deaf inmate and how much of what the inmate is trying to say is getting across. In a hearing which Defendants contend was adequate because Harrison communicated in writing, Harrison was charged with making loud noises in violation of prison regulations. In response he wrote: "I didn't making loud noise, I just called the porter for something. I'm 'deaf mute' I cannot hear but my voice is very loud noises" [sic]. His unquestioned due process right to a meaningful opportunity to respond to the charges against him cannot be said to have been satisfied based upon corrections staff's confidence that this communication was adequate. Given that Defendants are under an

affirmative burden to provide sufficient process, it is unavoidable that Plaintiffs' rights have been violated in this regard and summary judgment will issue in Plaintiffs' favor as to this point.

Also, for the reasons just enumerated, this failure by Defendants is also a violation of the ADA and the Rehabilitation Act. Due to the absence of interpretive services and/or assistive devices at parole and grievance hearings, class members do not receive an opportunity to benefit from the grievance process and the parole program that is equal to that of non-disabled inmates.

Declaratory judgment and injunctive relief will issue to the effect that Defendants' failure to provide interpretive services or other assistive devices to class members during disciplinary, grievance and parole proceedings is a violation of their due process rights and of the ADA and the Rehabilitation Act.

### 7. *Transfers Into/Out of the SDU for Disciplinary, Safety, Medical or Mental Health Reasons Violates the ADA and the Rehabilitation Act*

■ As was mentioned previously, deaf and hearing-impaired male inmates who are housed at the SDU are not parties to this action and conditions in the SDU are not here at issue. However class members who were housed in the SDU have been transferred from it to other facilities for disciplinary, safety and/or medical reasons. These other facilities lack to varying degrees, as has been discussed, necessary accommodations such as interpretive services, individual assistive devices, TDDs, closed caption decoders and visual safety alarms. Plaintiffs assert that such transfers violate the ADA and the Rehabilitation Act.

In one case a DOCS staff member noted that the SDU was in fact the "best" placement for plaintiff Harrison, but recommended placement in another prison, not equipped to accommodate his disability, due to his "difficulties dealing with other deaf inmates."

In addition, Newton testified to the effect that a potentially violent inmate could not be housed at the SDU for reasons of inmate safety. At oral argument it came to light that class members may be transferred out of the SDU if they develop a medical condi-

tion which cannot be treated by the medical clinic within Eastern, which houses the SDU.

Assuming *arguendo* that all of the needs of the Plaintiff class at issue in this litigation are adequately met at the SDU, Defendants' transfer and placement practice renders these accommodations *conditional* and is therefore violative of the ADA and the Rehabilitation Act. These statutes do not provide disabled individuals with an equal opportunity to participate in and benefit from programs and services *provided that* they are healthy, sane and well-behaved. Rather the statutes *unconditionally* provide for equal opportunity with or without reasonable accommodation. DOCS' authority and discretion regarding disciplinary confinement, administrative segregation, protective custody and medical care are well defined and described elsewhere. That authority cannot stand in tension with Defendants' obligations under the ADA and the Rehabilitation Act. If DOCS presently lacks the capacity to perform these necessary administrative functions without removing a class member from the SDU, this must be corrected. Since no material issue of fact has been joined as to this question, summary judgment will issue in favor of Plaintiffs.

### 8. *Absence of a Special Unit for Deaf and Hearing–Impaired Women Inmates Violates Equal Opportunity*

 Many, although not all, deaf and hearing-impaired male inmates have access to the services, equipment and support of the SDU. Female inmates are excluded from the SDU. Deaf and hearing-impaired male inmates in the SDU are, for the most part, provided with the interpretive services in educational, counselling and medical settings and the assistive devices that form the crux of this litigation.[4] In contrast the Female Sub–Class members receive, as has been detailed above, few or none of these accommodations. The only attribute that bars the Female Sub–Class members from entry into the SDU is the fact that they are women, thus the Defendants have created a classification based upon gender.

The only governmental interest that the Defendants have put forth to support the gender based distinction they have created is

that there are more male deaf and hearing-impaired inmates requiring services than female deaf and hearing-impaired inmates. However, this does not justify differential treatment of male and female inmates. *See Casey v. Lewis,* 834 F.Supp. 1477, 1550 (D.Ariz.1993).

Similarly, allegations of administrative convenience or savings of time, money and effort are insufficient justifications for Defendants' failure to provide female deaf and hearing-impaired inmates with the same services provided to male deaf and hearing-impaired inmates. *Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973); *Califano v. Goldfarb,* 430 U.S. 199, 217, 97 S.Ct. 1021, 1032, 51 L.Ed.2d 270 (1977); *West,* 847 F.Supp. at 407; *Bukhari,* 487 F.Supp. at 1172.

Therefore, under the Equal Protection Clause of the Fourteenth Amendment the Defendants must provide female deaf and hearing-impaired inmates with access to the same range of special services provided to male deaf and hearing-impaired inmates in the SDU. Inasmuch as no genuine issue of material fact has been joined regarding this issue summary judgment will be granted in favor of Plaintiffs.

Declaratory judgment will issue to the effect that Defendants' creation and maintenance of a special prison unit at which all or most of the needs of deaf and hearing-impaired inmates are accommodated, and which special unit is not available to women has created a gender-based classification without justification and deprives Female Sub–Class members of equal protection under the law.

### *Remedy*

Inasmuch as Plaintiffs have been granted summary judgment they have also satisfied the requirements for permanent injunctive relief. A further hearing as to the form of that relief, its implementation and timing will be scheduled at the convenience of the parties and the Court in the event that the parties are unable to agree on the form of injunctive relief and judgment.

---

**4.** It must be noted that since conditions inside the SDU are not at issue in this litigation and inmates housed in the SDU are not parties to this

action, this statement is not a finding of fact of this Court.

*Conclusion*

For the reasons set forth above, Plaintiffs' motion for declaratory judgment, permanent injunction and summary judgment is granted in part and denied in part as follows:

(i) summary judgment is granted as to Plaintiffs' claim that Defendants have violated the notice, consultation, self-evaluation and grievance procedure requirements of the ADA;

(ii) summary judgment is granted as to Plaintiffs' claim that Defendants have violated both the Rehabilitation Act and the ADA by their failure to provide interpretive services for various aspects of reception and classification;

(iii) summary judgment is granted as to Plaintiffs' claim that the absence or inadequacy of assistive communications devices for telephone and television and the absence of visual safety alarms violates both the ADA and the Rehabilitation Act;

(iv) summary judgment is granted as to Plaintiffs' claim that Defendants' failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counselling sessions violates the ADA, the Rehabilitation Act and the due process rights of class members;

(v) summary judgment is granted as to Plaintiffs' claim that Defendants' failure to provide qualified interpreters and/or other assistive devices during medical and mental health treatment violates class members' constitutional due process and privacy rights and in those instances of medical care in which communication between the patient and medical personnel are essential to the efficacy of the treatment, such failure violates the Eighth Amendment's prohibition against cruel and unusual punishment;

(vi) summary judgment is granted as to Plaintiffs' claim that Defendants' failure to provide qualified interpreters and/or other assistive devices in disciplinary, grievance and parole proceedings violates class members' due process rights;

(vii) summary judgment is granted as to Plaintiffs' claim that transfers out of, or refusals to transfer into the SDU for disciplinary, safety, medical or mental health reasons violates the ADA and the Rehabilitation Act; and

(viii) summary judgment is granted as to Plaintiffs' claim that Defendants' creation and maintenance of a special prison unit at which all or most of the needs of deaf and hearing-impaired inmates are accommodated—the Men's SDU—but from which women are excluded based on gender, violates the equal protection rights of the Female Sub-Class.

Declaratory judgments in favor of Plaintiffs as set out above are hereby granted.

Permanent injunctive relief will be granted following the hearing on remedy referred to above.

It is so ordered.